## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TRUSTEES of the IAM NATIONAL PENSION FUND** | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:21-cv-02152-RCL** |
| **M & K EMPLOYEE SOLUTIONS, LLC**, | |
| *Defendant.* | |

## <u>MEMORANDUM OPINION</u>

This case requires the resolution of several classic legal issues: the propriety of judicial review, appropriate timing of a counterclaim, and several difficult issues of statutory interpretation. The cause for these questions is the Employee Retirement Income Security Act ("ERISA") and its many provisions aimed at maintaining the stability of multiemployer pension plans ("MPPs"). Nationally, MPPs manage many billions of dollars in assets and serve millions of current and former employees. IAM National Pension Fund ("IAM") is one such plan. Through its trustees, it seeks confirmation in part and vacatur in part of an arbitration award resolving two discrete issues governing the calculation of liability to be assessed a former employer-participant in the plan. That former employer, M&K Employee Solutions, LLC ("M&K"), is the defendant in this action and seeks to keep IAM's lawsuit out of the courts, or alternatively, to vacate in part and confirm in part the award. After a deep dive into ERISA's labyrinthian statutory scheme, the Court concludes that it may review the award in full and holds that the arbitrator erred as a matter of law on the issues submitted to him by the parties. Accordingly, the Court will **VACATE** the award and **REMAND** to the arbitrator for further proceedings consistent with the Court's memorandum opinion.

1

## I.       BACKGROUND

This Court has previously explained much of the background on the relationship between M&K and IAM as well as the circumstances underlying M&K's withdrawal across three separate opinions in a related case.[1]  Therefore, a truncated review of the framework surrounding MPPs, followed by the background of the case at hand and its procedural history, is sufficient for present purposes.

### A.  ERISA and MPPs

In 1974, Congress passed ERISA "[t]o ensure that employees who were promised a pension would actually receive it."  *United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 39 F.4th 730, 734 (D.C. Cir. 2022).  One type of pension plan is an MPP, which is "maintained pursuant to a collective bargaining agreement between multiple employers and a union."  *Id.*; 29 U.S.C. § 1002(37)(A) (defining MPPs).  Unlike single employer pension plans, operated for the benefit of a single employer, MPPs are designed to serve many different employers "mostly in industries where there are hundreds or thousands of small employers going in and out of business and where the nexus of the employment relationship is the union that represents employees who typically work for many of those employers over the course of their career."  *United Mine Workers*, 39 F.4th at 734 n.1.

In the late 1970s, legislative attention turned to ERISA's inadequate protection of MPPs "from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans."  *Pension Ben. Guar. Corp. v. R.A. Gray*

---

[1] *Trustees of IAM Nat'l Pension Fund v. M & K Emp. Sols., LLC*, No. 20-cv-433 (RCL), 2021 WL 1546947 (D.D.C. Apr. 20, 2021) ("*IAM PI I*"); *Trustees of IAM Nat'l Pension Fund v. M & K Emp. Sols., LLC*, No. 20-cv-433 (RCL), 2021 WL 2291966 (D.D.C. June 4, 2021) ("*IAM PI II*"), *appeal dismissed,* No. 21-7072, 2022 WL 2389289 (D.C. Cir. Jan. 19, 2022); *Trustees of the IAM Nat'l Pension Fund v. M & K Emp. Sols., LLC*, No. 20-cv-433 (RCL), 2022 WL 594539 (D.D.C. Feb. 28, 2022) ("*IAM PI III*").

& Co., 467 U.S. 717, 722 (1984).  Specifically, in ERISA's original formulation, employers in MPPs were generally free to withdraw from MPPs without an ongoing obligation to support the plan—even as workers retained earned benefits.  *See United Mine Workers*, 39 F.4th at 734 & n.2. That put MPPs under significant financial stress.  *Id.* at 734–35.

So, in 1980, Congress added new obligations for employers withdrawing from MPPs with the passage of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), codified at 29 U.S.C. §§ 1381–1461.  The MPPAA was designed "to 'protect the financial solvency of multiemployer pension plans'" by implementing "withdrawal liability."  *IAM PI III*, 2022 WL 594539 at *1 (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 196 (1997)).  Withdrawal liability "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. . . . [Comprising] the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets."  *R.A. Gray*, 467 U.S. at 725 (citing 29 U.S.C. §§ 1381, 1391).  That liability is determined "as of" the last day of the "Plan Year" prior to the "Plan Year" during which the employer withdrew.  29 U.S.C. § 1391; *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 417–18 (1995).  Thus, a withdrawal during the 2018 Plan Year would generate liability based on the unfunded vested benefits as of the last day of the 2017 Plan Year.  That last day of the Plan Year is referred to as the "measurement date."

Upon an employer's withdrawal from an underfunded MPP, "[t]he MPPAA calls upon a plan's trustees, not the employer, to propose the amount of withdrawal liability and orders the trustees to set a payment schedule."  *IAM PI III*, 2022 WL 594539 at *1; 29 U.S.C. § 1382.  When calculating that liability, a plan actuary "must make numerous assumptions," such as "how long

employees will work and how long retirees will live," as well as the "discount rate, i.e., the rate at which the plan's assets will earn interest." *United Mine Workers*, 39 F.4th at 735.  If there are no specific regulations on the issue, plan actuaries are required to use "actuarial assumptions and methods which" (1) "in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations)" and (2) "in combination, offer the actuary's best estimate of anticipated experience under the plan."  29 U.S.C. § 1393(a).

If an employer wishes to dispute the liability calculation generated by the trustees, the employer "may timely initiate a dispute-resolution procedure, first by requesting review from the trustees and later by pursuing arbitration."  *IAM PI III*, 2022 WL 594539 at *1 (citing 29 U.S.C. §§ 1399(b)(2), 1401(a)(1)).  "[A] plan's determination of unfunded vested benefits 'is presumed correct unless a party contesting the determination shows by a preponderance of the evidence that' either '(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.'" *United Mine Workers*, 39 F.4th at 735–36 (quoting 29 U.S.C. § 1401(a)(3)(B)).  Furthermore, "[t]he court must apply a 'presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct.'"  *Id.* at 736 (quoting 29 U.S.C. § 1401(c)).

 "Upon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action . . . to enforce, vacate, or modify the arbitrator's award."  29 U.S.C. § 1401(b)(2).

## B. IAM's Operations and Actuarial Valuations

IAM is a qualifying MPP within the requirements of ERISA.  Arbitration Stipulation Undisputed Facts ¶ 1, ECF No. 1-2 at 2–9.  IAM "provides retirement benefits to employees who

performed covered work for employers that remitted contributions to the Fund in accordance with collective bargaining agreements with the International Association of Machinists and Aerospace Workers, AFL-CIO (or with affiliated local or district lodges)." *Id.* ¶ 2.

IAM's actuary prepares actuarial valuations and calculates withdrawal liability for employers withdrawing from IAM. *Id.* ¶¶ 9–10. In that role, the actuary must prepare actuarial valuations for a Plan Year which runs from January 1 to December 31. *Id.* ¶ 11. These valuations are made after the Plan Year concludes. *Id.* For example, the actuarial valuation for the 2016 Plan Year was produced on November 2, 2017. *Id.* ¶ 12. When computing the actuarial valuations, IAM's actuary must use a discount rate, along with other methods and assumptions, to determine the required calculation of unfunded vested benefits. *Id.* ¶¶ 12–15. The 2016 Plan Year actuarial valuation concluded that, as of the end of the 2016 Plan Year, IAM had unfunded vested benefits of $448,099,164. *Id.* ¶ 13. That calculation was based on a 7.5% discount rate and investment return assumption. *Id.* ¶ 14.

On January 24, 2018, IAM's actuary met with the Board of Trustees of IAM to review assumptions and methods used in making actuarial valuation calculations. *Id.* ¶ 15. After that meeting, "[IAM's actuary] changed various methods and assumptions used to calculate withdrawal liability for employers that effected a withdrawal from the Fund during the 2018 Plan Year, including reducing the discount rate from 7.50% to 6.50%." *Id.* ¶ 17. When IAM's actuary subsequently calculated the actuarial valuation for the 2017 Plan Year, it used the 6.5% discount rate and 7.5% investment return assumption—a discount rate only adopted following the meeting in January 2018. *Id.* ¶¶ 17, 21. The actuarial valuation for the 2017 Plan Year then showed unfunded vested benefits of $3,043,369,928. *Id.* ¶ 20.

### C. M&K's Relationship with IAM and M&K's Withdrawal

M&K Employee Solutions, LLC-Alsip ("M&K Alsip"), M&K Employee Solutions, LLC-Joliet ("M&K Joliet"), and M&K Employee Solutions, LLC-Summit ("M&K Summit"), along with the defendant, M&K, were a single employer for purposes of ERISA from October 1, 2012 through December 31, 2018. *Id.* ¶¶ 22–23. M&K Alsip, M&K Joliet, and M&K Summit were all parties to separate bargaining agreements that required them "to remit contributions to [IAM] on behalf of their respective employees who performed covered work." *Id.* ¶ 24. Those obligations began in October of 2012 and "were renegotiated and extended on several occasions." *Id.* ¶¶ 25–26. Each permanently ceased their obligations to IAM for different reasons. *Id.* ¶ 30. M&K Joliet's bargaining unit employees decertified representation, thus ending M&K Joliet's obligation on March 31, 2017. *Id.* M&K Summit negotiated a new collective bargaining agreement which ended required contributions on July 31, 2017. *Id.* And M&K Alsip terminated its collective bargaining agreement, ending its obligation on December 31, 2018. *Id.*

As a result, on June 26, 2018, IAM provided M&K with an estimate of withdrawal liability based on a complete withdrawal during the 2018 Plan Year. *Id.* ¶ 31. This meant that withdrawal liability was required to be assessed "as of" December 31, 2017, the measurement date for a withdrawal during the 2018 Plan Year. Critically, "the Fund provided M&K Employee Solutions a withdrawal liability estimate showing that a complete withdrawal during the 2018 Plan Year would be calculated using the new 6.5% discount rate [adopted after December 31, 2017], and calculated the '[e]stimated years to amortize withdrawal liability at 7.5%.'" *Id.* On June 14, 2019, IAM informed M&K that its share of unfunded vested benefits totaled $6,158,482 to be paid in 20

6

installments.  *Id.* ¶ 33.[2]  After M&K's request for review of the assessment was denied, it timely commenced an arbitration to dispute the computation of liability.  *Id.*  ¶¶ 34–35.

### D.  The Arbitration Proceedings and Decision

The parties proceeded to arbitration with arbitrator Stanley L. Aiges ("the Arbitrator"). Once in arbitration, IAM and M&K agreed to "submit to the Arbitrator . . . [certain] issues for resolution based in whole or in part on the facts set forth in a set of stipulated facts agreed to by" IAM and M&K.  Arbitration Stipulation ¶ 1, ECF No. 1-1.  Those issues were:

a. Whether it was a violation of ERISA, as amended, for the discount rate to be changed after the December 31, 2017 measurement date; and

b. Whether the "free-look" exception (ERISA § 4210, 29 U.S.C. § 1390) is available to M&K Employee Solutions and requires a recalculation of its withdrawal liability.[3]

*Id.*  Furthermore, IAM and M&K "agree[d] that, following the Arbitrator's resolution of the issues set forth in Paragraphs 1(a)-(b), M&K Employee Solutions [would] have an opportunity to challenge the assumptions, method, and manner in which the Fund calculated its withdrawal liability."  *Id.* ¶ 3.  The parties also submitted their agreed stipulated facts.  Arbitration Stipulation Undisputed Facts.

Pursuant to the parties' submitted issues, M&K moved for partial summary judgment in the arbitration proceeding and both IAM and M&K submitted briefing.  Arbitration Decision 9, ECF No. 1-3.  The Arbitrator issued an award, dated July 13, 2021, concluding that IAM erred by calculating M&K's withdrawal liability using assumptions and methods other than those in effect on December 31, 2017, and denying M&K's bid to invoke the free-look exception for the

---

[2] IAM originally assessed a liability from partial withdrawal during the 2017 Plan Year of $611,110 which it later withdrew without prejudice.  Arbitration Stipulation Undisputed Facts ¶ 32.

[3] The free-look exception allows an employer to withdraw from a plan within a specified period after joining without incurring withdrawal liability, thereby providing a "free look."  *See infra* Part III.D.

withdrawal of M&K Joliet and M&K Summit.  *Id.* at 36–37.  The Arbitrator's "[a]ward" stated as follows:

> 1. The Fund improperly failed to calculate M & K's withdrawal liability using the assumptions and methods in effect on the December 31, 2017 measurement date. M & K's motion for partial summary judgment is granted. The Fund is ordered to annul its assessment of withdrawal liability and to recalculate it using the methods and assumptions in effect on the December 31, 2017 Measurement Date.
>
> Jurisdiction is retained to resolve any dispute arising from the application of the foregoing order.
>
> 2. M & K's motion to invoke the free look exception with regard to its partial withdrawal by its Joliet and Summit facilities is denied.

*Id.*  IAM and M&K filed motions for reconsideration.  ECF No. 33-1 at 9.

By July 20, 2021, IAM recalculated the amount of withdrawal liability to accord with the Arbitrator's decision.  Letter from Stanley L. Aiges, Arbitrator, to Donald J. Vogel, Esq., Scopelitis, Garvin, Light, Hanson & Feary, and Anthony S. Cacace, Esq., Proskauer Rose, LLP. (Aug. 11, 2021) ("August 11 Letter"), ECF No. 7-3.  Following a July 23, 2021 conference call, the Arbitrator "agreed to issue a clarification" regarding his award on the first issue.  *Id.* Specifically, given IAM's recalculation of the withdrawal liability amount in compliance with the Arbitrator's instructions, the Arbitrator concluded that "[t]he matter of relief, then, appears to me to now be moot."  *Id.*  After clarifying the status of the first issue, the Arbitrator rejected M&K's request that the Arbitrator reconsider his ruling on the availability of the free-look exception.  *Id.* In sum, the Arbitrator's letter set the award as final by definitively resolving the two issues and rejecting any further reconsideration.  Finally, the Arbitrator acknowledged that M&K had the right to contest IAM's revised calculation by September 30, 2021.  *Id.*

M&K proceeded to contest several aspects of that revised calculation.  ECF No. 12-1.

### E.  IAM's Two Lawsuits

IAM has filed two lawsuits against M&K.

It first sued M&K, and other related defendants, in February 2020 to enjoin those defendants to pay the assessed withdrawal liability.  *IAM PI III*, 2022 WL 594539 at *2.  Under the MPPAA, employers "pay now, dispute later," meaning that they still have a duty to pay the calculated withdrawal liability even as they challenge the underlying calculations.  *Id.*  This rule is meant to protect the solvency of an MPP during a potentially lengthy arbitration.  *Id.*  That case's complicated procedural history, and this Court's several injunctions, are distinct from the present dispute.

IAM's second lawsuit, the subject of this opinion, was filed following the Arbitrator's decision.  IAM seeks to confirm in part and vacate in part the Arbitrator's award—asking this Court to vacate the portion of the award requiring it to assess withdrawal liability based on the methods and assumptions in effect on December 31, 2017, and affirm the portion rejecting M&K's bid to use the free-look exception.  Pls.' Compl., ECF No. 1.

M&K moved to dismiss the complaint for failure to state a claim.  Def.'s Mot. Dismiss, ECF No. 7; Def.'s Mem. In Supp. Mot. Dismiss ("Def.'s Dismiss Mem."), ECF No. 7-1.  M&K also pled a counterclaim to enforce the portion of the arbitration award requiring use of methods and assumptions in effect on December 31, 2017, and to vacate the portion denying it the free-look exception.  Def.'s Countercl., ECF No. 7 at 1–7.  IAM opposed M&K's motion to dismiss and moved in turn to dismiss M&K's counterclaim for failure to state a claim due to untimeliness.  Pls.' Cross-Mot. Dismiss, ECF No 8; Pls.' Mem. Opp'n and in Supp. Cross-Mot. Dismiss, ECF No. 8-1 ("Pls.' Dismiss Mem.").  M&K replied in support of its motion to dismiss.  Def.'s Reply, ECF No. 12.  M&K also opposed IAM's motion to dismiss.  Def.'s Opp'n Pls.' Cross-Mot. Dismiss, ECF No. 16.  And IAM replied.  Pls.' Reply Supp. Cross-Mot. Dismiss, ECF No. 20.

After the parties briefed the motions to dismiss, IAM moved for summary judgment to vacate in part and confirm in part the Arbitrator's award.  Pls.' Mot. Summ. J., ECF No. 24; Pls.' Mem. in Supp. ("Pls.' Summ. J. Mem."), ECF No. 24-1.[4]  M&K opposed.  Def.'s Opp'n Pls.' Mot. Summ J. ("Def.'s Summ. J. Opp'n"), ECF No. 31.  M&K then cross-moved for summary judgment to vacate in part and confirm in part the Arbitrator's award.  Def.'s Cross-Mot. Summ. J., ECF No. 32; Def.'s Mem. in Supp. Mot. Summ. J. ("Def.'s Summ. J. Mem."), ECF No. 32-1.[5]  IAM opposed M&K's motion for summary judgment and further supported its own motion.  Pls.' Mem. Opp'n Def.' Summ. J. Cross-Mot. ("Pls.' Summ. J. Reply"), ECF No. 33.  And M&K replied. Def.'s Reply in Supp. Cross-Mot. Summ. J. ("Def.'s Summ. J. Reply"), ECF No. 35.

The various motions are now ripe for the Court's review.

## II.       LEGAL STANDARDS

### A. Motions to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), a pleading must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible when the party "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A court "should assume the veracity" of well-pleaded factual allegations, *id.* at 679, which "must be presumed true and should be liberally construed in [the pleading party's] favor." *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 271 (D.D.C. 2011).  A court need not accept the party's legal conclusions in evaluating a motion to dismiss. *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 40 (D.D.C. 2018).

---

[4] M&K moved to strike or stay IAM's motion for summary judgment for substantially the same reasons as it moved to dismiss IAM's complaint.  ECF No. 26.  IAM opposed, ECF No. 29, and M&K replied, ECF No. 30.

[5] The Court recognizes that M&K's memorandum in support of its motion for summary judgment and opposition to IAM's motion for summary judgment differ from each other and the Court has carefully considered both.

### B. Summary Judgment Motions

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law."  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson*, 477 U.S. at 248).  Even hotly contested factual disputes will not defeat summary judgment if they are irrelevant under the governing law.  *Id.*  A factual issue is "genuine 'if the nonmovant presents evidence such that a reasonable [factfinder] could return a verdict for the nonmoving party.'"  *Occupational Safety & Health L. Project, PLLC v. Dep't of Lab.*, No. 1:21-cv-2028 (RCL), 2022 WL 3444935, at *3 (D.D.C. Aug. 17, 2022) (alteration in original) (quoting *Doe v. Exxon Mobil Corp.*, No. 1:01-cv-1357 (RCL), 2022 WL 3043219, at *7 (D.D.C. Aug. 2, 2022)).  The Supreme Court has further explained that if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (quoting Fed. R. Civ. P. 56) (internal quotation marks omitted).

To that end, the Court will "view the evidence in the light most favorable to" the nonmoving party and should not "make credibility determinations."  *Holcomb*, 433 F.3d at 895.  Furthermore, when evaluating the motion, a "court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

### C. Review of Arbitration Awards Between an Employer and an MPP

When reviewing an arbitration dispute between an employer and an MPP under ERISA, "[t]he arbitrator's findings of fact are presumed correct unless they are rebutted 'by a clear

preponderance of the evidence,' and the arbitrator's legal determinations are reviewed de novo."
*United Mine Workers*, 39 F.4th at 737 (internal citation omitted) (quoting 29 U.S.C. § 1401(c)).

## III.   DISCUSSION

The Court will discuss the series of motions by the parties in the following order.  (1)
M&K's motion to dismiss the complaint, or strike or stay the motion for summary judgment,
because the arbitration proceedings have not concluded; (2) IAM's motion to dismiss M&K's
counterclaim for untimeliness; (3) the cross-motions for summary judgment as to the merits of the
Arbitrator's award.

### A.  The Arbitration Proceedings Are Complete for the Arbitrator's Issued Award

As an initial matter, this Court must address M&K's motion to dismiss the complaint
because there has not been "completion of the arbitration proceedings."  29 U.S.C. § 1401(b)(2);
Def.'s Dismiss Mem. 5 (citing *JLNW, Inc. v. Nat'l Ret. Fund*, No. 17-cv-5095 (AJN), 2018 WL
4757953, at *4 (S.D.N.Y. Sept. 28, 2018)).  The completion language represents an "exhaustion
requirement that parties complete arbitration before judicial review is appropriate."  *JLNW*, 2018
WL 4757953 at *4.

In M&K's view, its pending challenges to IAM's revised withdrawal liability assessment
in the underlying arbitration bar this Court's review of the Arbitrator's already issued award.
Def.'s Dismiss Mem. at 5–7; ECF No. 12-1.  In opposition, IAM argues that the arbitration
proceedings are complete, or final, as to the issues before this Court, because the Arbitrator has
rendered the award as to those issues and has denied reconsideration.  Pls.' Dismiss Mem. 3–8.
This exhaustion requirement has generated "scarce caselaw."  *JLNW*, 2018 WL 4757953 at *5
(collecting cases).  After reviewing the statutory text and the available cases, this Court concludes
that the requirement has been satisfied.

### 1.  The Relevant Statutory Text

Beginning with the statutory structure, 29 U.S.C. § 1401(b) sets out what is required before enforcing, vacating, or modifying an arbitrator's award.  The most directly relevant provision, Section 1401(b)(2), reads as follows:

> Upon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, no later than 30 days after the issuance of an arbitrator's award, in an appropriate United States district court . . . to enforce, vacate, or modify the arbitrator's award.

29 U.S.C. § 1401(b)(2).  Focusing on the operative language, there must be "completion of the arbitration proceedings" the result of which is the "issuance of an arbitrator's award."  *Id.*  After that, "any party" is empowered to "enforce, vacate, or modify the arbitrator's award."  *Id.*

Without proper context, the language "completion of the arbitration proceedings" might very well suggest that M&K's position is the correct one—that every issue related to the challenge of a withdrawal liability assessment must be resolved before judicial review is appropriate.  However, "[t]he meaning of statutory language, plain or not, depends on context."  *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991).  And, in context, the answer is the reverse of M&K's position.  After all, the full statement is that there must be completion of the arbitration proceedings and "issuance of an arbitrator's award" before "the arbitrator's award" can be enforced, vacated, or modified.  A challenge to withdrawal liability does not demand one singular arbitrator's award resolving all the raised issues.  To the contrary, there may be several arbitrator's awards during a challenge to a single withdrawal liability assessment.  The completion language must be read within that context.

This case is an excellent example of why an arbitrator's award need not resolve the entire challenge to a withdrawal liability assessment.  The Arbitrator's award here resolved two specific

issues submitted by the parties.[6]  Arbitration Decision 36–37; August 11 Letter.  The next award will resolve additional issues.  *See* ECF No. 12-1.  But the fact that an additional award is in the works does not undermine the completed and final arbitration proceedings for the already issued award.

In sum, when an arbitrator issues an award resolving specific issues submitted by the parties, and the proceedings as to that arbitrator's award are complete, an action to enforce, vacate, or modify the arbitrator's award is appropriate.

### 2.  Decisions in Other Districts

The Court is not alone in coming to this conclusion.  Another district court, in a decision relied on by both parties, reached the same result for the same statutory section and held that when "an arbitrator finally resolves a separate issue that the parties have bifurcated from the others and submitted to arbitration, that decision is final and complete for the purposes of review."  *JLNW,* 2018 WL 4757953 at *6; *see* Def.'s Dismiss Mem. 5–6; Pls.' Dismiss Mem. 5–7; Def.'s Dismiss Reply 3.  There, "the parties fully submitted a specific issue for the arbitrator to review separately" and "held in abeyance" other issues. *JLNW,* 2018 WL 4757953 at *7.  "The arbitrator then reached a final decision" on the submitted issue and rendered a final award resolving it.  *Id.*  Accordingly, because the "arbitrator []therefore resolved the issue submitted to arbitration and [] resolved it definitively enough that it did not stand in need of further adjudication," the proceedings as to the award were complete and judicial review was appropriate.  *Id.*

---

[6] Both parties agree that the Arbitrator's award definitively and conclusively resolved the two issues submitted and that the issues cannot be relitigated before the Arbitrator.  *See* Def.'s Opp'n Pls.' Cross-Mot. Dismiss 4 n.2 ("Both parties agree that the award is final in the context of the arbitration (it is not subject to another motion to reconsider,) and for purposes of the Fund's claim for interim payments."); Pls.' Dismiss Mem. 6 (agreeing that the Arbitrator has no further authority over the two issues resolved by the Arbitrator's award).

The *JLNW* Court bolstered its reading by looking to the further language in Section 1401(b) stating that arbitration proceedings, "shall, to the extent consistent with th[e ERISA] subchapter, be conducted in the same manner, subject to the same limitations, carried out with the same powers . . . , and enforced in United States courts as an arbitration proceeding carried out under [the Federal Arbitration Act ("FAA")]."  29 U.S.C. § 1401(b)(3).  By reviewing Second Circuit cases on the topic, the *JLNW* Court concluded that the FAA's finality requirement is satisfied when "an arbitration award . . . resolve[s] all the issues submitted to arbitration, and []resolve[s] them definitively enough so that the rights and obligations of the two parties, with respect to the issues submitted, do not stand in need of further adjudication." *JLNW*, 2018 WL 4757953 at *4 (quoting *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 176 (2d Cir. 1998)).  That is, an arbitrator's award conclusively resolving specified and bifurcated issues is sufficiently final for immediate judicial review. *Id.* at *4–6.

While the parties were unable to identify a directly on point case for FAA finality in the D.C. Circuit, the closest decision suggests that this Circuit's view would be substantially the same as the Second Circuit's. *See Union Pac. R.R. Co. v. Surface Transp. Bd.*, 358 F.3d 31 (D.C. Cir. 2004).  In *Union Pacific*, the D.C. Circuit considered a multi-phase arbitration and whether a decision by the Surface Transportation Board reviewing the arbitrator's decision on the first phase was final enough to enable judicial review. *Id.* at 32–34.  The panel concluded that the decision reviewing the first phase was final because it "complete[d]" the first phase of the bifurcated proceedings. *Id.* at 34.  In so holding, the panel cited approvingly to the First Circuit's FAA jurisprudence, *id.* at 34–35 (citing *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 234–35 (1st Cir. 2001)), which is substantially the same as the Second Circuit's. *See Hart Surgical*, 244 F.3d at 234–35.

M&K's cited cases for Section 1401(b)'s exhaustion requirement do not lead this Court to a different result. Almost all of its cases are either inapposite or cut against M&K's position.[7] One decision, however, is both relevant and contrary to this Court's opinion. *See Nat'l Dairy Ass'n v. W. Conf. of Teamsters Pension Tr. Fund,* No. 17-cv-0214 (RSL), 2017 WL 6310623 (W.D. Wash. Dec. 11, 2017). In *National Dairy Association*, the parties agreed to bifurcate the resolution of three issues, and the arbitrator issued an "Interim Award & Opinion" resolving one of them. *Id.* at *1. Even though the first issue was resolved in the arbitration proceedings, the court concluded that "[t]he arbitrator's work in this case [was] not done" and because two issues remained to be resolved "judicial review [was] premature." *Id.* at *2. This Court, however, finds the language of the statute and the reasoning of *JLNW* more persuasive. The *National Dairy Association* Court focused on the phrase "[u]pon completion of the arbitration proceedings" while giving little attention to the later statutory language of "arbitrator's award." *See* 29 U.S.C. § 1401(b)(2). As this Court has explained, a challenge to a withdrawal liability assessment might include several "arbitrator's awards" resolving different issues. By failing to recognize and apply this fact, the *National Dairy Association* Court erred.

### 3. Application to this Award

M&K's ultimate contention—that the arbitration was not actually bifurcated into different parts—also fails. The parties chose two issues to "submit to the Arbitrator . . . for resolution." Arbitration Stipulation. In M&K's own words, the agreement was for resolution of "two

---

[7] One involved waiver of arbitration. *Robbins v. Chipman Trucking Inc*, 693 F. Supp. 628, 639 (N.D. Ill. 1986), *aff'd,* 848 F.2d 196 (7th Cir. 1988)*,* and *aff'd,* 866 F.2d 899 (7th Cir. 1988). Two other cases resolved whether arbitration proceedings were complete when a dispositive issue had been satisfied, without touching on the effect of bifurcation. *See Genz-Ryan Plumbing & Heating Co. v. Sheet Metal Workers' Loc. 10*, 207 F. Supp. 3d 1038, 1041–42 (D. Minn. 2016); *Bd. of Trustees of W. Conf. of Teamsters Pension Tr. Fund v. Loomis Armored Car, Inc.*, 626 F. Supp. 218, 219 (W.D. Wash. 1986). Another case cuts against M&K's position and cites approvingly to *JLNW*. *Riverbay Corp. v. Serv. Emps. Int'l Union Loc. 32BJ*, No. 18-cv-4660 (RA), 2019 WL 1244568, at *3 (S.D.N.Y. Mar. 18, 2019).

*preliminary* issues" by the Arbitrator that were "specified and discrete" from other issues.  Def.'s Summ. J. Opp'n 12, 18 (emphasis in original).  The Arbitrator issued an award resolving both, Arbitration Decision 36–37, and then finalized the decision by letter, August 11 Letter.  M&K concedes that the Arbitrator's award on both submitted issues has been finalized and that neither issue is subject to relitigation.  Def.'s Opp'n Pls.' Cross-Mot. Dismiss 4 n.2.  The arbitration proceedings have thus come to completion as to the award before this Court.

In sum, because there had been "completion of the arbitration proceedings" as to "an arbitrator's award," "any party" was permitted to bring an action "to enforce, vacate, or modify the arbitrator's award."  29 U.S.C. § 1401(b)(2).  M&K's motion to dismiss will be denied. Because its motion to strike or stay relied on the same arguments now rejected by this Court, it will also be denied.

### B.  M&K's Counterclaim is Timely

Alongside its motion to dismiss, M&K pled a counterclaim to enforce the portion of the arbitration award requiring use of methods and assumptions in effect on December 31, 2017, and to vacate the portion denying it use of the free-look exception.  Def.'s Countercl.  IAM moved to dismiss, arguing that the time to file the counterclaim had expired.  Pls.' Dismiss Mem. 8–9.

Once again, the Court must turn to Section 1401(b).  It states that "[u]pon completion of the arbitration proceedings in favor of one of the parties, any party thereto may bring an action, *no later than 30 days after the issuance of an arbitrator's award* . . . to enforce, vacate, or modify the arbitrator's award."  29 U.S.C. § 1401(b)(2) (emphasis added).

IAM argues that the counterclaim was untimely because the period to file it expired on September 3.  Pls.' Dismiss Mem. 8–9.  Under its formulation, the clock started on the day that the Arbitrator issued his decision, July 13, 2021.  *Id.*; Arbitration Decision.  Then, the clock was suspended between July 20 and August 11 while a motion to reconsider was pending, before

restarting upon the issuance of the Arbitrator's letter on August 11.  Pls.' Dismiss Mem. 8–9; *see* 29 C.F.R. § 4221.9(a).   Under this calculation method, M&K's counterclaim, filed on September 10, would be one week late.

IAM's timeline presumes that the award to be enforced, vacated, or modified was issued on July 13 for purposes of calculating the 30 days.  The Court, however, concludes otherwise. While the Arbitrator rendered his decision on July 13, his award explicitly retained jurisdiction over how to enforce one of the two issues that he was tasked with resolving.  Arbitration Decision 36–37.  In his August 11 letter, the Arbitrator delivered "a clarification" regarding his prior award and only after concluding that "[t]he matter of relief, [as to the issue over which the Arbitrator retained jurisdiction] appear[ed] to now be moot" did he release jurisdiction on that issue. August 11 Letter.  The 30-day timeline began to run at that time.  Indeed, IAM agrees that "the deadline to enforce, vacate, or modify a withdrawal liability arbitration award begins to accrue once the 'arbitrator *finally* resolves a separate issue that the parties have bifurcated from the others and submitted to arbitration.'"  Pls.' Reply Supp. Cross-Mot. Dismiss 3 (emphasis added) (quoting *JLNW,* 2018 WL 4757953 at *6–7).  There was no such final resolution until the Arbitrator's self-imposed hold on the first issue was resolved by letter on August 11.  August 11 Letter.  For that same reason, IAM's reliance on the implementing regulations which "suspend[] the 30–day period" upon "filing of a written motion for modification or reconsideration" misses the mark.  *See* 29 C.F.R. § 4221.9(a).  This suspension scheme did not come into effect because the Arbitrator had not finalized his resolution of the first issue, so there was no clock to suspend.[8]

---

[8] The lack of finality from a self-retained jurisdiction is functionally different from the lack of finality caused by a motion to reconsider or modify.  Those motions act to temporarily suspend an otherwise final award because the parties wish to change an otherwise ultimate decision.  *See* 29 C.F.R. § 4221.8–9.  Here, the Arbitrator's award was not an otherwise ultimate decision until he relinquished jurisdiction "to resolve any dispute arising from the application of the foregoing order."  Arbitration Decision 36–37.  The clock consequently never started.

Furthermore, this understanding is the only one that makes practical sense within the statutory structure.  Consider the result if the Arbitrator's award were understood to have been issued on July 13.  The parties would have 30 days from that date to bring an action in federal court.  However, the Arbitrator's remaining work on the first issue would preclude the necessary finality for review.  *See supra* Part III.A.  The arbitration proceedings as to the award were, after all, not at "completion" until the self-initiated retention of jurisdiction was relinquished.  *See* 29 U.S.C. § 1401(b)(2).  It was only when the Arbitrator sent his letter that the award was finalized and ripe for review.  *See* August 11 Letter.  IAM's position would mean that an award can be issued for purposes of the 30-day period to bring an action but not final for purposes of review.  Accordingly, a delay by an arbitrator in finalizing resolution of an issue could deprive the parties of the opportunity to ever bring an action.  Such an absurd result is not required, nor suggested, by the statute.  The award was not issued here for purposes of Section 1401(b)(2) until the Arbitrator sent his letter.

In sum, the 30-day clock did not begin to run until August 11, 2021.  M&K had until September 10 of that year to file an action to enforce, vacate, or modify the award.  It met that timing requirement, and this Court will reject IAM's motion to dismiss.

## C. The Arbitrator Incorrectly Decided that Assumptions Must be Adopted by the Measurement Date

"Federal pension law is a highly specialized field" that can prove "terribly opaque."  *See Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 350–52 (7th Cir. 2012).  True to form, the individual provisions cited by the parties on the measurement date dispute—a critical issue in this case—are multifarious and complex.  Before diving into pages of statutory intricacies, it may be helpful to step back and consider again what is at issue.

The question before the Court is about the permissible timing of an actuarial assumption. That specific actuarial assumption is the discount rate, "i.e., the rate at which the plan's assets will earn interest." *United Mine Workers*, 39 F.4th at 735. The discount rate assumption will naturally affect the plan's calculation of its unfunded vested benefits because unfunded vested benefits are "the difference between the present value of vested benefits and the current value of the plan's assets." *R.A. Gray*, 467 U.S. at 725 (citing 29 U.S.C. §§ 1381, 1391). When the discount rate assumption is revised downward, the value of unfunded vested benefits must increase, along with withdrawal liability for departing employers. It is also important to remember that there is nothing special about the discount rate assumption within the statutory scheme. Congress set standards for actuarial assumptions generally without a specific mention of "discount rate." *See* 29 U.S.C. § 1393. Lastly, when an employer withdraws from an MPP, its withdrawal liability must be determined "as of" the last day of the Plan Year prior to its withdrawal (the measurement date). *See supra* Part I.A.

The Court is tasked with deciding whether the Arbitrator was correct, as a matter of law, that ERISA requires a discount rate assumption to be adopted by the measurement date to affect liability for employers that withdraw during the following Plan Year. After careful consideration, the Court concludes that the Arbitrator was incorrect. ERISA allows actuarial assumptions adopted after the measurement date to be used for withdrawal liability assessments. However, the Court rejects IAM's theory that actuaries are free to rely on information from *any time* when producing those post-measurement-date actuarial assumptions. Instead, assumptions must be limited to the body of knowledge available *on or before the measurement date*. That is, the actuary cannot rely on events and factual developments that occur after the measurement date, but it *can*

collect and analyze the data generated as of the measurement date to understand the factual universe that existed on that date.

The Court will begin by diagraming out the relevant portion of the statutory scheme. Through that process, the Court hopes to traverse the maze of ERISA and reveal the ordinary legal principles lurking within. After deciphering the statute's text, the Court will set forth its affirmative understanding of the correct rule. Finally, the Court will apply its rule to the Arbitrator's decision.

### 1. Relevant Statutory Provisions

The focus of the Court's statutory inquiry is Subtitle E of Title 29 of the United States Code, which contains "Special Provisions for Multiemployer Plans." Part 1 of that subtitle contains Congress's plan for employer withdrawals and how liability is to be calculated. Section 1381 establishes what exactly withdrawal liability is. It states that, upon complete or partial withdrawal of an employer from an MPP, "[t]he withdrawal liability of an employer to a plan is the amount determined under [§] 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted [by four additional steps]." 29 U.S.C. § 1381 (a), (b)(1). The four adjustment steps do not affect the current issue.

Section 1391 next provides how to determine the "amount of the unfunded vested benefits allocable to an employer." *Id.* § 1391(a). That complicated section consists of nearly 3,500 words, which the Supreme Court has helpfully summarized. In short, it "explains (a) how to determine a plan's total underfunding; and (b) how to determine an employer's fair share (based primarily upon the comparative number of that employer's covered workers in each earlier year and the related level of that employer's contributions)." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417. Section 1391 also "instructs a plan to make the withdrawal charge calculation, not as of the day of withdrawal, but *as of the last day of the plan year preceding the year during which the*

*employer withdrew*—a day that could be up to a year earlier." *Id.* at 417–18 (emphasis in original) (citing 29 U.S.C. §§ 1391(b)(2)(A)(ii), (b)(2)(E)(i), (c)(2)(C)(i), (c)(3)(A), and (c)(4)(A)); *see* 29 U.S.C. § 1391 (using the language "as of the end of the plan year preceding the plan year in which the employer withdraws" and similar formulations to define how to calculate unfunded vested benefits). This concept of "as of" is made far simpler when directly applied to this case. Here, the unfunded vested benefits for M&K's withdrawal liability calculation must be as of December 31, 2017. In short, December 31, 2017 is the measurement date.

Next, the Court must consider the provision laying out Congress's restrictions on the "[a]ctuarial assumptions" to be used "in determining unfunded vested benefits of a plan for computing withdrawal liability." 29 U.S.C. § 1393(a). Once again, it is worth reiterating that the "unfunded vested benefits" calculation is critical because withdrawal liability is essentially just "the allocable amount of unfunded vested benefits." *See id.* § 1381(b)(1).

There are two permissible paths prescribed by Congress for defining the actuarial assumptions and methods to be used for calculating unfunded vested benefits. The first allows a plan to use "actuarial assumptions and methods set forth in the corporation's regulations." *Id.* § 1393(a)(2). IAM does not allege that it relied on any such regulations here. *See* Pls.' Summ. J. Mem. 12 n.5. Therefore, IAM was obligated to follow the second path, which requires that withdrawal liability "be determined by each plan on the basis of—[]actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1). Congress also specifically allowed a plan actuary to rely on less than perfect information, including (1) "the most recent complete actuarial valuation used for purposes of [minimum funding] and reasonable estimates for

the interim years of the unfunded vested benefits" as well as (2) "in the absence of complete data

. . . data available or on data secured by a sampling which can reasonably be expected to be

representative of the status of the entire plan."  *Id.* § 1393(b).  In accordance with minimum

funding requirements, plans must submit "a determination of experience gains and losses and a

valuation of the plan's liability . . . not less frequently than once every year."  *Id.* § 1084(c)(7)(A).

There are a few additional sections of the statute worth highlighting.  First, the scheme

contains an explicit anti-retroactivity provision for certain kinds of plan rules and amendments

which are used to calculate withdrawal liability.  Those rules and amendments may not "be applied

without the employer's consent with respect to liability for a withdrawal or partial withdrawal

which occurred before the date on which the rule or amendment was adopted."  *Id.* § 1394(a).

Congress also required uniform application of the rules and amendments so that they "shall operate

and be applied uniformly with respect to each employer, except that special provisions may be

made to take into account the creditworthiness of an employer."  *Id.* § 1394(b).  Finally, Congress

obligated plan sponsors[9] to give notice of such rules and amendments.  *Id.*  Although the discount

rate at issue is an actuarial assumption, rather than one of these rules or amendments, the existence

of these provisions provides relevant context for understanding the overall statutory scheme.  *See*

*id.* §§ 1389, 1391(c) (comprising the kinds of rules and amendments covered by Section 1394).

Next, two provisions set out timing for calculation of unfunded vested benefits.  Section

1021 requires a plan to provide an estimate of withdrawal liability upon an employer's request.

*Id.* § 1021(l).  The estimate is based on a hypothetical scenario where the employer withdrew on

the last day of the Plan Year prior to the year of the request.  *Id.*  Given the "as of" rule, the

---

[9] A plan sponsor is "the plan's joint board of trustees" "or if the plan has no joint board of trustees, the plan administrator."  29 U.S.C. § 1301(a)(10).  IAM has a board of trustees.  *See, e.g.*, Pls.' Summ. J. Mem. 6.

estimated withdrawal liability is then calculated as of the last day of the Plan Year two years prior to the Plan Year during which the employer requested the estimate.  For example, if an employer makes a request to IAM on September 30, 2022, it will receive an estimate of withdrawal liability calculated as of a December 31, 2020 measurement date.  *See id.*  The plan must furnish this estimate, and an explanation of the actuarial assumptions and other relevant inputs used to generate it, within 180 days of the request.  *Id.*  Another timeliness provision, Section 1399, states that an employer actually withdrawing from a plan shall receive notice of the "amount of the liability" and "the schedule for liability payments" "as soon as practicable after an employer's . . . withdrawal."  *Id.* § 1399(b).  Both provisions implicitly acknowledge that calculation of withdrawal liability will lag the end of the relevant Plan Year.

Finally, Congress imposed highly deferential review of the actuary's "determination of a plan's unfunded vested benefits for a plan year" directing that "the determination is presumed correct" unless the contesting party shows one of two things by a preponderance of the evidence.  *Id.* § 1401(a).  The challenging employer must either show that "the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations)" or that "the plan's actuary made a significant error in applying the actuarial assumptions or methods."  *Id.*

If there is a per se statutory rule barring use of an actuarial assumption chosen after the measurement date, for withdrawals to be calculated as of that date, the rule must live within the aforementioned provisions.

### 2.  The Rule Resulting from the Statutory Provisions

The Court begins its analysis  with Section 1381 and Section 1391.  The former establishes that the key to withdrawal liability is the "allocable amount of unfunded vested benefits" for an employer.  *Id.* § 1381(b)(1).  The latter requires the assessment to be made "as of" the measurement

date.  *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417–18; 29 U.S.C. § 1391.  "As of" is generally defined as "at or on (a specific time or date)," *As of*, Webster's Third New Int'l Dictionary 129 (1965), or "used to indicate a time or date at which something begins or ends," *As of*, Merriam–Webster Dictionary Online, http://www.merriamwebster.com/dictionary/as%20of (last visited Sept. 20, 2022).  The "as of" language can cut in multiple directions.  One version, put forward by IAM, provides that the "as of" rule has no bearing on the choice of actuarial assumptions like the discount rate.  Specifically, IAM argues that the "as of" limitation only applies to the "plan's assets and liabilities" which must be "fixed" on the measurement date, while actuarial assumptions may be updated afterward such that they represent "the actuary's best estimate on the date of calculation."  Pls.' Summ. J. Mem. 17, 26.  Second, M&K argues that previously adopted assumptions still in effect on the measurement date are fixed for withdrawal liability calculations as of that date.  *See* Def.'s Summ. J. Mem. 17–21.  Finally, there is a third option in the middle of those two positions.  This reading allows actuarial assumptions to be determined after the measurement date so long as the factual basis for the assumptions is "as of" the measurement date.  *See* Pls.' Summ. J. Mem. 26 (using a similar theory as an in the alternative argument).  Under that interpretation, assumptions must be based on the plan's experience and the available knowledge up to and including the measurement date, but no further.  This third option best fits the statutory scheme.

The Court starts with IAM's theory that actuaries can rely on factual information from any point in time when generating assumptions.  It concludes that this reading fits poorly within the statutory structure and precedent.

Computation of unfunded vested benefits must be made "as of the last day of the plan year preceding the year during which the employer withdrew."  *Milwaukee Brewery Workers' Pension*

*Plan*, 513 U.S. at 417–18 (emphasis removed).  At the very least, IAM agrees that the "as of" requirement demands fixing the assets and liabilities of the plan at the measurement date.  *See* Pls.' Summ. J. Mem. 17.  But this Court reads the language to encompass actuarial assumptions as well.  This follows from the expansive scope of what Section 1391 covers.  It governs the "determination of . . . the amount of the unfunded vested benefits allocable to an employer."  29 U.S.C. § 1391; *see Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417–18.  This determination involves multiple inputs.  Assets and liabilities are two obvious ones, but actuarial assumptions are themselves simply additional inputs in the determination.  And because the "as of" language governs the entire determination of unfunded vested benefits, assumptions and methods fall under the "as of" requirement.

This understanding fits with Section 1393's requirement that actuaries use "reasonable expectations" "tak[e] into account the experience of the plan" and make a "best estimate of anticipated experience."  29 U.S.C. § 1393(a)(1).  IAM suggests that actuaries could develop assumptions based on events that occur months after the measurement date, and perhaps that have even dramatically affected the assets and liabilities that remain frozen at the measurement date.  But it would be an exceedingly odd to hold assets and liabilities of the plan at one date and allow "taking into account the experience of the plan" past that same date.  *See id.*  The more natural understanding of the interplay between Section 1391 and Section 1393 is that they fix the factual underpinnings for determining actuarial assumptions and methods at the measurement date, just as Section 1391 fixes the factual composition of the plan's assets and liabilities.  Then, after the measurement date, the actuary can collect and consider the data, understand the experience of the plan up through the end of the Plan Year, and consider what assumptions and methods are reasonable and best estimate anticipated experience from the viewpoint of the measurement date.

IAM asserts that the use of present tense in Section 1393(a)(1) means that Congress must have required actuarial assumptions to be established from the date of the withdrawal liability calculation.  Pls.' Summ. J. Mem. 13.  However, given the applicability of Section 1391 to the entirety of the unfunded vested benefits determination, the two sections must be read in conjunction.  Consequently, the plan actuary does use assumptions that "are reasonable" and "offer the actuary's best estimate," *id.* (quoting § 1393(a)(1)), but the reasonableness and best estimate are focused at the measurement date, rather than the date of calculation.

An actuarial standard cited by IAM validates that requiring actuarial assumptions to be generated based on the body of knowledge available by the measurement date is not unnatural.  Of course, no actuarial standard can overcome statutory requirements. *United Mine Workers*, 39 F.4th at 740.  But such standards can provide helpful context.  And the Actuarial Standards Board ("ASB") advises in a standard of practice titled "Changes In Circumstances" that "[t]he actuary should select economic assumptions that reflect the actuary's knowledge as of the measurement date."  ASB, Actuarial Standard of Practice No. 27, § 3.5.5 (June 2020); *accord* ASB, Actuarial Standard of Practice No. 27, § 3.5.5 (Sept. 2013) ("The economic assumptions selected should reflect the actuary's knowledge as of the measurement date.").  This reference to the knowledge available "as of the measurement date" helps to underscore that grounding actuarial assumptions in the factual universe at the measurement date is not so bizarre a result as to suggest a serious error of statutory interpretation.

IAM relies on the next portion of that actuarial standard of practice to support its own argument that actuaries should be able to consider events that occur after the measurement date: "If the actuary learns of an event occurring after the measurement date that would have changed the actuary's selection of an economic assumption, the actuary may reflect this change as of the

measurement date." ASB, Actuarial Standard of Practice No. 27, § 3.5.5; Pls.' Summ. J. Mem. 16; Pls.' Summ. J. Reply 3; *see also* ASB, Actuarial Standard of Practice No. 27, § 3.5.5 (Sept. 2013) (addressing the same situation, but stating "[*i*]*f appropriate*, the actuary may reflect this change as of the measurement date" (emphasis added)).  The very wording of the sentence—that if a post-measurement-date event *would have changed* a selection, the event *may be* reflected "as of the measurement date"—suggests a kind of exception to the "as of" requirement.  The language "as of" and the pronouncement that "economic assumptions [should] reflect the actuary's knowledge as of the measurement date" conflict with allowing a post-date event.  ASB's standard appears to provide actuaries with the go-ahead to bypass the "as of" restriction, but ERISA does not—it requires its application to the entirety of the unfunded vested benefits determination, 29 U.S.C. §§ 1381, 1391.  And in a contest between the ASB and Congress, ERISA wins.  *United Mine Workers*, 39 F.4th at 740.

Beyond a direct reading of the statutory text, and consideration of actuarial practice, the Circuit's decision in *Combs v. Classic Coal Corp.*, 931 F.2d 96 (D.C. Cir. 1991), undermines IAM's position and supports requiring actuarial assumptions to be based on the body of knowledge at the measurement date.  The panel there considered the propriety of an arbitrator "consider[ing] evidence gathered after [an employer's] withdrawal to find the assumptions used to calculate [its] withdrawal liability unreasonable."  *Id.* at 102.  The Circuit explained that a withdrawal liability "calculation is like a snapshot, in that it represents the actuary's best estimate given the evidence *then available*."  *Id.* (emphasis in original) (quoting *Combs v. Classic Coal Corp.*, No. 84-cv-1562 (TPJ), 1990 WL 66583, at *8 n.10 (D.D.C. Apr. 6, 1990)) (internal quotation marks omitted).  Considering the best estimate requirement, the Circuit held that pension plans were not "*require*[*d*]

. . . to base their assumptions on information gathered *after* the fiscal year-end of the [p]lans." *Id.* (emphases in original).

IAM's reading that actuaries can use any information to develop assumptions would replace a "snapshot" at the end of the Plan Year with a freewheeling assessment beyond the confines of the measurement date. Such a reading would conflict with *Combs*'s rule that a withdrawing employer is not entitled to challenge a withdrawal liability assessment using "information gathered *after*" the end of the relevant Plan Year. *See id.* (emphasis in original). At the same time, IAM argues that other language in the opinion stating that "[the plan] relied upon evidence 'then available,' i.e., available at the time of [the employer's] withdrawal, to calculate [withdrawal] liability," supports its contention that the operative time period for assumptions is the time of calculation, rather than the measurement date. *See id.* (emphasis removed); Pls.' Summ. J. Mem. 25–26. However, the Circuit's subsequent focus on "information gathered after the fiscal year-end of the Plans" reflects the measurement date as being the fulcrum for the "snapshot" rather than the day of calculation. *See Combs*, 931 F.2d at 102.

Yet, even as the Court rejects IAM's primary reading, it is unconvinced by M&K's. The defendant's reading would fix all actuarial assumptions and methods to those adopted before the measurement date and thus require assumptions and methods to roll over if not affirmatively changed. This strikes the Court as an improper interpretation of how the "as of" requirement must be applied to the determination of actuarial assumptions.

First and most importantly, M&K's reading is in tension with the requirement that a plan actuary "tak[e] into account the experience of the plan and reasonable expectations[]" as well as use "the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a). Under M&K's theory, actuaries would be required to use *every actuarial assumption and method*

last adopted before the measurement date, and prior to having the full data and information for a Plan Year.  Assumptions and methods would need to be determined and finalized before knowing "the experience of the plan" at the time of the measurement date and before a "best estimate of anticipated experience" could be generated.  *See id.*[10]  This conflict provides a strong textual reason to reject M&K's contention.

The tension is underscored by two D.C. Circuit cases looking at the requirements for generating actuarial assumptions under Section 1393.

Turning back to the *Combs* case, the Circuit made clear that actuarial assumptions should be determined based on a "snapshot" centered on the evidence "then available" by "the fiscal year-end of the [p]lans."  *See Combs*, 931 F.2d at 102.  M&K, however, would bar an actuary from using that end-of-Plan-Year snapshot to develop assumptions.  Instead, actuaries would be made to develop and adopt assumptions before the snapshot is available, or to simply roll over prior assumptions.  Both conflict with how the Circuit contemplated that actuarial assumptions would be made.

Second, in a recently issued decision, the Circuit provides further insight into the role of an actuary in selecting assumptions—undermining M&K's reading of ERISA.  In that case, a withdrawing employer challenged the use of a "risk-free" discount rate assumption by an MPP actuary, in part, because it was not "[the actuary's] best estimate of anticipated experience under the plan."  *United Mine Workers*, 39 F.4th at 736–38; 29 U.S.C. § 1393(a)(1).  The Circuit agreed

---

[10] While it is true that plan actuaries "may" "rely on" less than complete information like "the most recent complete actuarial valuation" for minimum funding purposes and "reasonable estimates for the interim years," that does not lead this Court to adopt M&K's position.  *See* 29 U.S.C. § 1393(b)(1).  *Enabling* actuaries to use "most recent" information and "reasonable estimates" for building a model that complies with Section 1393(a)'s larger directive does not naturally read as *requiring* actuaries to use all the last adopted assumptions prior to the measurement date.  Indeed, to bolster its argument, M&K misstates the language of Section 1393 writing that "an actuary *must* 'rely on the most recent complete actuarial valuation'" rather than *may*.  *See* Def.'s Summ. J. Mem. 17–18 (emphasis added).

with the challenge and held that Section 1393 establishes (1) "a procedural rule that the assumptions be made by the actuary" and (2) "a substantive rule that the assumptions reflect the characteristics of the plan." *United Mine Workers*, 39 F.4th at 738.  Applied to the discount rate, the Circuit held that Section 1393's substantive rule requires the assumption to be "based on the plan's actual investments." *Id.* at 740.  Consequently, the Circuit rejected the risk-free discount rate assumption because the "discount rate assumption was not chosen based on the Pension Plan's past or projected investment returns." *Id.*; *see id.* at 738 ("[I]f the plan is *currently* and projects to be invested in riskier assets, the discount rate used to calculate withdrawal liability *must reflect that fact*." (emphases added)).[11]  And the Circuit determined that this substantive rule has teeth, holding that "[i]f [an] actuary is not basing the assumptions on the plan's characteristics, the assumptions will not be reasonable." *Id.* at 141.

M&K's reading conflicts with the reasoning of the *United Mine Workers* Court.  The Circuit read Section 1393 to demand that an actuary select the actuarial assumptions and "to base his assumptions on the Plan's actual characteristics." *Id.* at 738, 743.  That requirement does not allow actuarial assumptions to simply apply from one Plan Year to the next without action by the plan actuary.  Automatically rolled over assumptions are not selected by the actuary for that Plan Year (the procedural rule), and, in the context of the discount rate, a rolled over assumption is certainly not "based on the plan's actual investments" (the substantive rule).  *See id.* at 738–40. Moreover, if actuaries were instead forced to create assumptions prior to the end of the Plan Year, they would still fail the Circuit's substantive rule that "assumptions reflect the characteristics of

---

[11] M&K points to two authorities in response.  The first, *D.A. Nolt & Roofers Local No. 30 Combined Pension Fund v. D.A. Nolt, Inc.*, held that a plan may not issue a retroactive revision of withdrawal liability calculations after an assessment and review process, suggesting nothing of relevance for the current question.  *See* 719 F. Supp. 2d 530, 546–51 (E.D. Pa. 2010), *aff'd*, 444 F. App'x 571 (3d Cir. 2011).  The second, a Pension Benefit Guaranty Corporation ("PBGC") opinion letter, makes substantially the same point and has the same lack of relevance.  *See* PBGC Opinion Letter No. 90-2 (Apr. 20, 1990).

the plan" and, for the discount rate, that the assumption be "currently" "based on the plan's actual investments" and experience.  *See id.*  "By not tak[ing] into account the experience of the plan" a rolled over assumption, or one made without considering the plan's characteristics at the measurement date, is "therefore [] not a reasonable assumption."  *See id.* at 741.

The best reading of Section 1391 and Section 1393, alongside the D.C. Circuit's two cases on actuarial assumptions, is that actuaries may generate assumptions after the measurement date for withdrawals during the following Plan Year.  However, the assumptions must be based on the plan's experience up to the measurement date and from the viewpoint of the measurement date. This interpretation best aligns the text of the statutory provisions, *Comb*'s snapshot approach, and the *United Mine Workers* requirement that actuaries choose their assumptions and do so based on the plan's actual experience.  By grounding assumptions in the snapshot of the world on the measurement date, assumptions are properly determined "as of" that date.[12]

The Court acknowledges that its reading contradicts a Second Circuit decision on this topic. *See Nat'l Ret. Fund On Behalf of Legacy Plan of Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc.* ("*Metz*"), 946 F.3d 146 (2d Cir. 2020), *cert. denied sub nom. Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc.*, 141 S. Ct. 246 (2020).  M&K cites to that case and the Arbitrator heavily relied on it. But after careful consideration, this Court respectfully disagrees with the Second Circuit's reasoning.

---

[12] ERISA's timing provisions ensure that an actuary has sufficient time to consider the factual universe as of the measurement date and calculate appropriate assumptions.  For withdrawal liability estimates, a plan need only provide, at the earliest, an estimate of withdrawal liability 1.5 years following the relevant measurement date along with the actuary's assumptions and methods.  *See* 29 U.S.C § 1021(l).  For withdrawals, the scheme provides that a plan will only be required to provide the liability assessment "as soon as practicable after an employer's . . . withdrawal."  *Id.* § 1399(b).

There, the Second Circuit held that the last discount rate assumption adopted prior to the measurement date becomes fixed for all withdrawal liability determined as of that measurement date. *Id.* at 152. Specifically, the Second Circuit held that:

> [I]nterest rate assumptions for withdrawal liability purposes must be determined as of the last day of the year preceding the employer's withdrawal from a multiemployer pension plan. Absent any change to the previous plan year's assumption made by the Measurement Date, the interest rate assumption in place from the previous plan year will roll over automatically.

*Id.* The panel, in reversing the district court's contrary conclusion, relied on several considerations. First, it explained that Section 1393 is "silent as to whether interest rate assumptions on the Measurement Date must be affirmatively adopted, or whether, absent an actuary's affirmative selection of a new assumption rate, the rate in effect during the previous plan year rolls over automatically," and noted that an interest rate assumption is generally stable. *Id.* at 150. Given that silence, the panel found Section 1394's notice and anti-retroactivity requirements for plan rules and amendments to be helpful, alongside the legislative history of the section, concluding that they support anti-retroactivity for actuarial assumptions as well. *Id.* at 150–51. It also found an employer's right to demand a withdrawal liability estimate to count in favor of fixing actuarial assumptions to those adopted before the measurement date. *Id.* at 151 (citing 29 U.S.C. § 1021(l)). Finally, the *Metz* Court feared that, without such a rule, there would be "opportunity for manipulation and bias." *Id.* at 151–52.

This Court respectfully disagrees with the *Metz* Court's contentions.

First, this Court agrees that Section 1393 is not explicit on the timing of assumptions. But the directives in Section 1393 about "tak[ing] into account the experience of the plan" "reasonable expectations" and "the actuary's best estimate of anticipated experience" undermine the argument that assumptions can be allowed to merely roll over. *See* 29 U.S.C. § 1393(a). This is true even

though the "as of" requirement grounds the whole determination at the time of the measurement date. *See id.* § 1391.  The best reading of those two provisions together is not that assumptions can be allowed to roll over, but rather that the assumptions must be based on the plan's experience, reasonable expectations, and the best estimate of anticipated experience from the viewpoint of the measurement date.

Second, this Court understands Section 1394 to have the opposite import as the one given to it by the Second Circuit.  The presence of an anti-retroactivity provision in the section dealing with plan rules and amendments, and the absence of one in the section dealing with actuarial assumptions, suggests that anti-retroactivity was purposefully omitted in the latter.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452–53 (2002).  And the Second Circuit's excerpt of legislative history says nothing to the contrary.  *See Metz*, 946 F.3d at 150.  In fact, the cited report plainly states that Congress was only targeting "plan rules and amendments" with an anti-retroactivity protection.  *See id.* (citing H.R. Rep. No. 96-869, pt. 2 at 30).  And even if Section 1394 were to embody a legislative intent against anti-retroactivity that is to be applied to the entire statutory scheme, it would still not counsel in favor of M&K here.  Section 1394 only prevents retroactive application of rules and amendments adopted after an employer's *withdrawal*, rather than after the measurement date.  29 U.S.C. § 1394(a).  The discount rate change here happened before M&K's withdrawal, not after.  Arbitration Stipulation Undisputed Facts ¶¶ 27, 30–31.

Third, the Second Circuit's reliance on the right of an employer to demand a withdrawal estimate is unpersuasive.  The Second Circuit cites that provision as proof that actuarial assumptions cannot be adopted after the measurement date because "[s]uch provisions are of no value if retroactive changes in interest rates assumptions may be made at any time."  *Id.* at 151 (citing 29 U.S.C. § 1021(l)).  Yet, as this Court explained, that estimate will be as of the last day

of the Plan Year two years prior to the date that the estimate is requested.  The Second Circuit contemplated that Section 1021(l) enables employers to demand the applicable actuarial assumptions before deciding whether to withdraw.  *See id.*  However, the withdrawal estimate under that section will always be out-of-date and represent what would have happened if the employer withdrew during the prior Plan Year.  *See* 29 U.S.C. § 1021(l)(1)(A).  Congress did not require that employers receive the applicable actuarial assumptions prior to a decision to withdraw, which is consistent with a statutory scheme that allows for formulation of those assumptions after the measurement date.

 Fourth, the Second Circuit worried that "the selection of an interest rate assumption after the Measurement Date would create significant opportunity for manipulation and bias" by enabling plans "to pressure actuaries to assess greater withdrawal liability on recently withdrawn employers."  *Metz*, 946 F.3d at 151.  This Court disagrees that the Second Circuit's concern counsels in favor of its rule for two principal reasons.

Most importantly, the statute already deals with the Circuit's apprehension.  The actuarial assumptions must be, in the aggregate, "reasonable (taking into account the experience of the plan and reasonable expectations)" and "offer *the actuary's* best estimate of anticipated experience under the plan."  29 U.S.C. § 1393(a)(1) (emphasis added).  If the applied assumptions are not the actuary's best estimate, or are unreasonable, then they should be challenged on those grounds.  *See United Mine Workers*, 39 F.4th at 738 ("[There is] a procedural rule that the assumptions be made by the actuary and a substantive rule that the assumptions reflect the characteristics of the plan.").

And even if this Court were to consider fashioning a rule based on policy, or purpose-based concerns, the Second Circuit's choice seems likely to create a more extreme risk of manipulation and bias.  Rather than requiring that actuaries generate the best assumptions based on the evidence

then available, the Second Circuit' rule enables "the interest rate assumption in place from the previous plan year [to] roll over automatically." *Metz*, 946 F.3d at 152.  Consider a plan with a relatively low discount rate.  If the plan believed that review of the Plan Year's data would indicate that the rate should be increased (thus lowering future withdrawal liability), but wished to avoid that outcome, it would need only delay adoption of a new actuarial assumption until after the measurement date.  For example, it could try to slow the speed of its actuary to delay final adoption of a new discount rate.  Or the plan could fire its actuary and delay the new actuary from adopting its assumptions until after the measurement date.  Those methods of manipulating withdrawal liability, in compliance with the Second Circuit's rule, strike this Court as more likely than affirmatively causing an actuary to adopt malicious actuarial assumptions after the measurement date.  Indeed, the Supreme Court has recognized that plan actuaries are "apparently unbiased professional[s], whose obligations tend to moderate any claimed inclination to come down hard on withdrawing employers." *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 635 (1993).  To generate a rule that assumes actuaries will disregard professional obligations and manipulate withdrawal liability on behalf of pension plans would be to disregard the Supreme Court's understanding of actuarial independence.  And, if the purpose of the MPPAA were a consideration in fashioning the relevant rule, then the Court would heed that "Congress enacted the MPPAA to protect the financial solvency of multiemployer pension plans" and develop its rule accordingly.  *See Bay Area Laundry*, 522 U.S. at 196.  But neither policy, nor legislative intent, guides the Court's decision here.  Rather, the statutory text and prior precedent dictate this Court's reading.

*     *     *

In sum, the Court concludes that the statutory structure, relevant precedent, and policy concerns do not support the Second Circuit's rule that actuarial assumptions may, and indeed must, roll over when not changed before the measurement date. Instead, the statute is best read to allow later adoption of actuarial assumptions, so long as those assumptions are "as of" the measurement date—that is, the assumptions must be based on the body of knowledge available up to the measurement date. That rule best complies with Congress' dual directives that unfunded vested benefits be determined "as of" the measurement date and that actuarial assumptions be generated by "taking into account the experience of the plan and reasonable expectations" such that they "offer the actuary's best estimate of anticipated experience." *See* 29 U.S.C. §§ 1391, 1393(a)(1). The plan's experience, reasonable expectations, and the best estimate of anticipated experience are therefore evaluated, not from the date of calculation, but rather from the viewpoint of the measurement date, just as the statutory scheme's "as of" requirement demands.

### 3.  Application of the Rule to the Arbitrator's Decision

Having clarified the proper interpretation and resulting rule, this Court must now consider the Arbitrator's decision. The Arbitrator concluded that a fund must use "the assumptions and methods in effect" on the relevant measurement date when calculating withdrawal liability. Arbitration Decision 17–23. To come to that rule, he relied on several sources, including Section 1391, the *Metz* decision, and *D.A. Nolt*. *Id.* The Court appreciates the Arbitrator's reasoned decision, but his rule conflicts with the best reading of ERISA and D.C. Circuit precedent. It is accordingly incorrect as a matter of law. Therefore, this Court will vacate the Arbitrator's award insofar as it establishes that IAM had to "us[e] the assumptions and methods in effect on the December 31, 2017 Measurement Date." Arbitration Decision 36.

At the same time, the Court cannot hold that the 6.5% discount rate was determined as of the measurement date. Plaintiffs urge this Court to do so, arguing that the evidence shows its

37

assumptions were based on the factual universe at the time of the measurement date.  *See* Pls.'
Summ. J. Mem. 26.  M&K, for good measure, does not help its situation by implying that IAM's
actuary based its decision only on information available before the measurement date (to
demonstrate that it was adopted later for wrongful purposes). *See* Def.'s Summ J. Mem. 17 ("[T]he
modeling on interest rates in [IAM's actuary's] PowerPoint is all based on data that predates the
December 31, 2017 Measurement Date . . . [i]t would, therefore, be pure speculation to conclude
that [the actuary] changed the discount rate on the basis of any particular information").
Nevertheless, the record before this Court, including the stipulation of facts generated during the
arbitration, does not sufficiently settle the question.  It is not even clear that the Court should do
so, even if it thought the record was clear, given that the Arbitrator was not given an opportunity
to apply the proper legal rule in the first instance.  *Cf. I.A.M. Nat. Pension Fund Ben. Plan C. v.
Stockton TRI Indus.*, 727 F.2d 1204, 1207–08 & n.7 (D.C. Cir. 1984) (likening review of an
arbitrator in this context to review of an administrative agency and recognizing that Congress
expressed a preference for "initial resolution of the dispute in a non-judicial forum").  Either way,
the question will be left to the Arbitrator, now supplied with the effective legal rule to apply.

Along those lines, the Court recognizes that M&K has spent a good portion of its briefing
questioning the circumstances by which the discount rate assumption was adopted in this case.
Def.'s Summ. J. Mem. 26–30.  M&K asserts that the rate was adopted, not because it was
reasonable or a best estimate, but rather to increase withdrawal liability.  *See id.*  Furthermore,
M&K argues that, in reality, it was IAM's trustees that chose the 6.5% discount rate, and points to
parts of the record to indicate that IAM's actuary will not defend the assumption as reasonable or
in keeping with actuarial standards.  *Id.*  The Court reiterates that those allegations are not a reason
to create an extra-statutory rule, particularly given that the statute provides guidelines for the

procedure and substance of assumptions, 29 U.S.C. § 1393, along with a means for attacking challenged assumptions, *id.* § 1401(a)(3)(B); *see also United Mine Workers*, 39 F.4th at 738–40 (discussing the procedural and substantive requirements for actuarial assumptions).  In front of the Arbitrator, M&K can pursue its allegations within Congress's guidelines for testing the legality of actuarial assumptions imposed on an employer through a withdrawal liability assessment. Included within that framework is the opportunity to show that IAM has failed to comply with Congress's requirement for actuarial assumptions as described in this opinion.  The Court can provide nothing more than that.

### D.  The Arbitrator Incorrectly Decided that M&K Did Not Qualify for the Free-Look Exception

The final issue in this case is whether M&K was entitled to the free-look exception.  Under that exception, an employer may contribute to a plan for an initial specified period and then withdraw without liability, so long as the plan elects to allow this "free look."  *See* 29 U.S.C. § 1390.  Specifically, "[a]n employer . . . is not liable to the plan" if the employer (1) "withdraws from a plan in complete or partial withdrawal" and (2) "had an obligation to contribute to the plan for no more than . . . the number of years required for vesting under the plan."  *See id.* § 1390(a).[13] IAM chose to enact the free-look exception and set the specified period to vest at five years. Arbitration Stipulation Undisputed Facts ¶ 7.

M&K argues that it was entitled to the free-look exception because it started contributing to IAM in 2012 and two of its entities, M&K Joliet and M&K Summit, ceased contributing within the first five years of M&K's obligation.  Def.'s Opp'n Summ. J. 36–42.  The Arbitrator disagreed. He came to this conclusion by applying a provision of ERISA which directs that multiple entities

---

[13] There are other statutory requirements that the parties agree are satisfied here.  Pls.' Summ. J. Mem. 5 n.1.

in a controlled group are to be considered "a single employer." 29 U.S.C. § 1301(b)(1); Arbitration Decision 32–36.  Both parties agree that the three relevant M&K entities here, M&K Joliet, M&K Summit, and M&K Alsip, were a controlled group and thus a single employer under that section. Arbitration Stipulation Undisputed Facts ¶¶ 22–23.  Both parties also agree that M&K Joliet and M&K Summit withdrew before any M&K entity had an obligation of more than five years.  *Id.* ¶ 30*.*  M&K Alsip, however, continued contributing to IAM for more than five years.  *Id.*  Because the collective entities ended up having an obligation for longer than five years, the Arbitrator concluded that the free-look exception did not apply to M&K as a single employer.  Arbitration Decision 32–36.

The Court concludes that the Arbitrator erred as a matter of law in determining that M&K was not entitled to the free-look exception. The single employer combination of the three M&K entities met the free-look exception's requirements because it had (1) a "complete or partial withdrawal" and (2) "an obligation to contribute to the plan for no more than" five years.  *See* 29 U.S.C. § 1390(a).

First, the cessation of M&K Joliet and M&K Summit's obligations to IAM constituted a partial withdrawal by the single employer M&K.  Under ERISA, an employer partially withdraws when there is "a partial cessation of the employer's contribution obligation." *Id.* § 1385(a)(2), (b)(2) (laying out the specifics required for a partial cessation).  This is as opposed to a complete withdrawal, which terminates completely the employer's obligation to contribute to a plan or covered operations.  *Id.* § 1383(a).

A partial cessation is exactly what happened in March 2017 and then again in July 2017. In March, M&K Joliet ended its obligation to IAM when representation was decertified. Arbitration Stipulation Undisputed Facts ¶ 30.  In July, M&K Summit ceased its obligation with

the negotiation of a new collective bargaining agreement.  *Id.*  Treating those entities as part of a single M&K employer, M&K ceased its contribution obligations at those two locations, which ultimately triggered a partial withdrawal during the 2017 Plan Year.  *See* 29 U.S.C. § 1385(a)(2), (b)(2).  In fact, IAM determined that M&K had engaged in "a partial withdrawal" "based upon a cessation of [M&K's] obligation to contribute to the Fund at [the] company's Joliet, IL location effective March 31, 2017 and [the company's] Summit, IL location effective July 31, 2017."  ECF No. 1-2 at 319. The Arbitrator also concluded that M&K had a "partial withdrawal by its Joliet and Summit facilities."  Arbitration Decision 37.

Second, the single employer M&K "had an obligation to contribute to the plan for no more than" five years.  *See* 29 U.S.C. § 1390(a).  The best reading of the combined language "an employer who withdraws from a plan in complete or partial withdrawal" and "had an obligation to contribute to the plan for no more than [a specified time period]" is that, together, they require the length of the obligation to be considered at the time of the withdrawal.  *See id.*  This is particularly true given that the exception applies to partial withdrawals along with complete withdrawals.  *Id.*  An employer's obligation to a plan definitionally continues after a partial withdrawal.  *See id.* § 1385(a)(2), (b)(2).  If the obligation requirement for the free-look exception were held open indefinitely, and not assessed at the time of withdrawal, then any "free look" for a partial withdrawal would eventually time out when the employer passed the specified obligation period.  But Congress chose to include both partial withdrawals and complete withdrawals in the free-look exception.  Consequently, the employer's obligation must be measured at the time of the withdrawal.

The only question then is, at the time of the partial withdrawal, did the single employer M&K have an obligation of less than five years?  And the answer, stipulated by the parties, is yes.

Arbitration Stipulation Undisputed Facts. ¶¶ 22–23, 30.  So, "treat[ing the] 'controlled group' employer like any other ERISA employer," *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 636 F. Supp. 641, 657 (N.D. Ill. 1986), M&K's partial withdrawal met the free-look exception's requirements.

To come to the contrary conclusion, the Arbitrator relied on *South City Motors, Inc. v. Automotive Industries Pension Trust Fund*.  No. 17-cv-04475, 2018 WL 2387854 (N.D. Cal. May 25, 2018), *aff'd* 796 F. App'x 393 (9th Cir. 2020).  The district court there held that "a control-group employer is not exempt from withdrawal liability unless the [single] employer . . . meets all of the free look's requirements."  *Id.* at *6.  Similarly, the Ninth Circuit, in affirming, held that "for purposes of the free look exemption, the word employer refers to the [entities] as a controlled group—not the individual [entities]—and [when] the controlled group does not meet all of the requirements to be eligible for the free look exemption, neither do the individual [entities]."  *See S. City Motors*, 796 F. App'x at 395–96.  In sum, both courts held what the statute plainly requires: that a controlled group must be treated as a single employer when applying the free-look exception.  And, unlike the single employer in *South City Motors*, the single employer M&K *did* meet the requirements to invoke a "free look" at the time of its partial withdrawal.  M&K had a partial withdrawal, with an obligation to IAM of no more than five years, and therefore the Arbitrator erred by denying it the exception.

Finally, because the Arbitrator did not allow M&K to invoke the exception, he did not decide how M&K's eligibility for a "free look" regarding its partial withdrawal affects liability for M&K's subsequent complete withdrawal.  *See* Arbitration Decision 32–37.  Because the Arbitrator did not address this question in the first instance, the Court will remand to the Arbitrator for a determination.  *Cf. I.A.M. Nat. Pension Fund Ben. Plan C.*, 727 F.2d at 1207–08 & n.7.

## IV.    CONCLUSION

Based on the reasoning above, this Court will **GRANT IN PART AND DENY IN PART**
IAM's motion for summary judgment and **GRANT IN PART AND DENY IN PART** M&K's
motion for summary judgment. The Court will **DENY** M&K's motion to dismiss and motion to
strike. It will further **DENY** IAM's motion to dismiss.

The result is that this Court will **VACATE** the Arbitrator's award to the extent that it
requires that assumptions and methods be adopted by a plan prior to the measurement date
applicable to a withdrawal and to the extent that it rejects that M&K was eligible for the free-look
exception with regard to its partial withdrawal by its Joliet and Summit facilities. The Court will
**REMAND** to the Arbitrator for further proceedings consistent with its memorandum opinion.

A separate order will issue.

Date: September 28, 2022

Royce C. Lamberth
United States District Judge